IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

CITY OF SURPRISE, AN ARIZONA MUNICIPAL CORPORATION,
*Petitioner,*

*v.*

ARIZONA CORPORATION COMMISSION; TOM FORESE, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE ARIZONA CORPORATION COMMISSION; BOB BURNS, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE ARIZONA CORPORATION COMMISSION; ANDY TOBIN, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE ARIZONA CORPORATION COMMISSION; BOYD W. DUNN, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE ARIZONA CORPORATION COMMISSION; AND JUSTIN OLSON, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE ARIZONA CORPORATION COMMISSION,
*Respondents,*

*and*

LAKE PLEASANT 5000, L.L.C., AN ARIZONA LIMITED LIABILITY COMPANY; HARVARD INVESTMENTS, INC., A NEVADA CORPORATION; AND CIRCLE CITY WATER COMPANY, L.L.C., AN ARIZONA LIMITED LIABILITY COMPANY,
*Real Parties in Interest.*

No. CV-18-0137-SA
Filed March 28, 2019

Special Action from the Arizona Corporation Commission
No. W-03510A-18-0095
**JURISDICTION ACCEPTED; RELIEF GRANTED IN PART;**
**ORDER MODIFIED**

COUNSEL:

Andrew M. Jacobs (argued), Timothy J. Sabo, Snell & Wilmer L.L.P., Phoenix; and Robert Wingo, Surprise City Attorney, Surprise, Attorneys for City of Surprise

Andy M. Kvesic (argued), Robin R. Mitchell, P. Robyn Poole, Arizona Corporation Commission Legal Division, Phoenix, Attorneys for Arizona Corporation Commission, Commissioner Tom Forese, Commissioner Bob

Burns, Commissioner Andy Tobin, Commissioner Boyd W. Dunn, and Commissioner Justin Olson

Dale S. Zeitlin (argued), Zeitlin & Zeitlin, P.C., Phoenix; and Garry D. Hays, Law Offices of Garry Hays, Phoenix, Attorneys for Lake Pleasant 5000, L.L.C. and Harvard Investments, Inc.

Meghan H. Grabel (argued), Osborn Maledon, P.A., Phoenix, Attorney for Circle City Water Company, L.L.C.

Christina Estes-Werther, General Counsel, League of Arizona Cities and Towns, Phoenix, Attorney for Amicus Curiae League of Arizona Cities and Towns

———————————

VICE CHIEF JUSTICE BRUTINEL authored the opinion of the Court, in which CHIEF JUSTICE BALES and JUSTICES TIMMER, GOULD, LOPEZ and PELANDER (RETIRED) joined.  JUSTICE BOLICK filed an opinion concurring in part and dissenting in part.

———————————

VICE CHIEF JUSTICE BRUTINEL, opinion of the Court:

¶1        The Arizona Corporation Commission ("Commission") has broad authority under A.R.S. § 40-285(A) to approve the sale or disposition of a public service corporation's assets.  In this special action, we hold that § 40-285(A) does not give the Commission power over a city's exercise of eminent domain.  Accordingly, we vacate the portion of the Commission's March 30, 2018 order requiring the public utility to apply for Commission approval of the proposed condemnation.

## I.    BACKGROUND

¶2        In October 2017, the City of Surprise ("City") entered into a letter of intent with Circle City Water Company, L.L.C. ("Circle City"), documenting the City's intent to condemn substantially all the assets of Circle City, including the right to almost four thousand acre-feet of water per year from the Central Arizona Project ("CAP").  Pursuant to statute, Surprise voters authorized the condemnation and the Surprise City Council approved the filing of a condemnation action.  A residential developer contends that Circle City is obliged under an existing contract to allocate its CAP water for a planned development.  Upon inquiry by the developer, the

City advised that it has no obligation to provide water under the existing contract. The developer then asked the Commission to enter an order preventing the sale of Circle City's CAP allocation to the City.

**¶3**        The Commission opened an investigation. On March 30, 2018, the Commission ordered Circle City to file an application under § 40-285 and Arizona Administrative Code ("A.A.C.") R14-2-402(D), seeking Commission authorization "to abandon, sell, lease, transfer, or otherwise dispose of its utility." At the time of the order, the Commission was aware that the negotiations between the City and Circle City were intended to result in condemnation, not a sale. Circle City filed the application under protest. Commission staff determined that Circle City did not fully comply with the March 30 order by failing to include a copy of the draft condemnation agreement between Circle City and the City. At the Commission's direction, Circle City provided a copy of the draft agreement under seal. The Commission then required Circle City to confirm in writing whether the City would assume Circle City's water contract with the developer.

**¶4**        Shortly thereafter, the City filed this special action, alleging the Commission acted without jurisdiction in entering the March 30 order. This Court stayed further administrative proceedings pending resolution of this case.

**¶5**        We accepted jurisdiction over this special action to clarify the scope of the Commission's authority over eminent domain proceedings pursuant to A.R.S. § 40-285(A). We have jurisdiction pursuant to article 6, section 5(1) of the Arizona Constitution and A.R.S. §§ 12-2001 and 12-2021.

## II.        DISCUSSION

### A.        Jurisdiction

**¶6**        This Court has original jurisdiction to issue "mandamus, injunction and other extraordinary writs to state officers." Ariz. Const. art. 6, § 5(1); *see also* A.R.S. §§ 12-2001, -2021. Such jurisdiction is discretionary and is requested through a special action petition. *Dobson v. State ex rel. Comm'n on Appellate Court Appointments*, 233 Ariz. 119, 121 ¶ 6 (2013). Special action jurisdiction is appropriate in cases that involve "purely legal questions of statewide importance" or that require an

"immediate and final resolution," *id.* at 121 ¶¶ 7–8, and particularly appropriate when a defendant "has proceeded or is threatening to proceed without or in excess of jurisdiction or legal authority," Ariz. R.P. Spec. Act. 3(b). But special action jurisdiction is not appropriate when parties have an "equally plain, speedy, and adequate remedy by appeal." *Id.* 1(a).

¶7  Here, the scope of Commission authority involves a purely legal question of statutory interpretation: whether the Commission has exceeded its statutory authority. The City cannot presently appeal the Commission's order because it is not a party to the administrative proceedings, and the City has no other means to challenge the Commission's actions. For those reasons, special action review is appropriate. *See Ariz. Corp. Comm'n v. State ex rel. Woods*, 171 Ariz. 286, 288 (1992) (granting special action review because "this court can best serve the public interest and principles of judicial economy by resolving fundamental legal questions regarding the Commission's constitutional power at this time").

## B. Standing

¶8  The Commission asserts that the City lacks standing to bring this action and the City's case is not ripe for decision. This Court is "not constitutionally constrained to decline jurisdiction based on lack of standing" because the Arizona Constitution, unlike the Federal Constitution, contains no "case or controversy" requirement. *Sears v. Hull*, 192 Ariz. 65, 71 ¶ 24 (1998). Whether to deny standing in Arizona is a matter of "prudential or judicial restraint." *Dobson*, 233 Ariz. at 122 ¶ 9 (quoting *Armory Park Neighborhood Ass'n v. Episcopal Cmty. Servs. in Ariz.*, 148 Ariz. 1, 6 (1985)). Our courts exercise restraint to ensure they "refrain from issuing advisory opinions, that cases be ripe for decision and not moot, and that issues be fully developed between true adversaries." *Bennett v. Brownlow*, 211 Ariz. 193, 196 ¶ 16 (2005).

¶9  The Commission argues that because it has taken no action against the City and has not attempted to "regulate the condemnation," the City has not suffered any injury. But its March 30 order requiring Circle City to file an application pursuant to § 40-285 "for authority to abandon, sell, lease, transfer, or otherwise dispose of its utility" in the face of the City's proposed condemnation constitutes an injury to the City. While facially directed only at Circle City, the assertion of authority under that

statute, if valid, would give the Commission the authority to void the City's condemnation action. Further, standing is suggested by Arizona's declaratory judgment statute, which provides that a party whose "rights, status or other legal relations are affected by a statute" may seek declaratory relief regarding the statute's construction. A.R.S. § 12-1832; *see also id.* § 12-1842 ("This article is declared to be remedial; its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations; and is to be liberally construed and administered."); *Dobson*, 233 Ariz. at 122 ¶ 11; *cf. Merrill v. Phelps*, 52 Ariz. 526, 529 (1938) (noting that action under the declaratory judgment statute was "the simplest and the best way" of resolving conflicting claims regarding statutory and constitutional authority of public officials). The Commission's indirect assertion of regulatory authority over the City is sufficient injury to provide standing.

## C.    Standard of Review

**¶10**    We review the interpretation of statutes de novo, seeking to effectuate the legislature's intent. *Stambaugh v. Killian*, 242 Ariz. 508, 509 ¶ 7 (2017). If the statute is subject to only one reasonable interpretation, we apply it without further analysis. *Id.* To make this determination, we look to the statute's words and context. *Id.* If the statute is susceptible to more than one reasonable interpretation, we consider secondary interpretive principles such as "the context of the statute, the language used, the subject matter, its historical background, its effects and consequences, and its spirit and purpose." *State ex rel. Polk v. Campbell*, 239 Ariz. 405, 406 ¶ 5 (2016) (quoting *Ariz. Citizens Clean Elections Comm'n v. Brain*, 234 Ariz. 322, 325 ¶ 11 (2014)).

## D.    Commission Authority Over Condemnation Proceedings

**¶11**    The Commission argues it has authority to regulate condemnations under § 40-285(A) and A.A.C. R14-2-402(D). Section 40-285(A) provides:

> A public service corporation shall not sell, lease, assign, mortgage or otherwise dispose of or encumber the whole or any part of its railroad, line, plant or system necessary or useful in the performance of its duties to the public . . . without first having secured

> from the commission an order authorizing it so to do. Every such disposition, encumbrance or merger made other than in accordance with the order of the commission authorizing it is void.

A.A.C. R14-2-402(D)(1) provides that "[a] utility shall not abandon, sell, lease, transfer, or otherwise dispose of its facilities or operation without first obtaining authority therefor from the Commission." The City argues § 40-285(A) does not apply because the statutory language does not reference condemnation proceedings and because a condemnation is neither a sale nor other voluntary transfer, as the statute otherwise contemplates. The Commission asserts that the phrase "or otherwise dispose of" is sufficiently broad to include a transfer resulting from a condemnation. Because § 40-285(A) does not expressly include transfers through condemnation proceedings, we must decide whether condemnations are included by the phrase "or otherwise dispose of."

**¶12** The Commission's interpretation of "otherwise dispose of" is inconsistent with the context of the statute. "[S]ell, lease, assign" and "mortgage" are all voluntary transactions; a condemnation, in contrast, is an involuntary governmental taking of assets. *See United Water N.M., Inc. v. N.M. Pub. Util. Comm'n*, 910 P.2d 906, 909 ¶ 10, 910 ¶ 14 (N.M. 1996) (rejecting the public utility commission's assumption of jurisdiction over the transfer of utilities from a public utility to a city, reasoning that the statute granting power to the commission contained terms — "sell, lease, rent, purchase or acquire" — addressing only voluntary acts). Even a so-called "friendly" condemnation is ultimately not voluntary because Circle City has no choice but to accede to the taking of its assets pursuant to court order. *See* A.R.S. §§ 12-1114(1), -1114(6), -1116(A); *cf. United Water N.M., Inc.*, 910 P.2d at 910 ¶15 (stating "a contract or agreement for sale or purchase is a consensual, voluntary relationship" because "both a seller and a buyer have the right to select with whom each will contract, and *neither can be forced to agree*" (emphasis added) (quotation omitted)). And even if the parties can reach agreement, the City's exercise of the power of eminent domain requires it to pay just compensation for the assets condemned. Ariz. Const. art. 2, § 17; *Salt River Project Agric. Improvement & Power Dist. v. Miller Park, L.L.C.*, 218 Ariz. 246, 249 ¶ 11 (2008). Agreeing on just compensation rather than litigating the issue makes the condemnation no less coercive.

**¶13** Our conclusion is supported by the interpretive canons *expressio unius est exclusio alterius* and *noscitur a sociis*. *Expressio unius est exclusio alterius*—the expression of one item implies the exclusion of others—is appropriate when one term is reasonably understood as an expression of all terms included in the statutory grant or prohibition. *Jennings v. Woods*, 194 Ariz. 314, 330 ¶ 81 (1999); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107 (2012). *Noscitur a sociis*—a word's meaning cannot be determined in isolation, but must be drawn from the context in which it is used—is appropriate when several terms are associated in a context suggesting the terms have some quality in common. *See Ariz. Dep't of Water Res. v. McClennen*, 238 Ariz. 371, 376 ¶ 26 (2015); *see also* Scalia & Garner, *supra*, at 195–96.

**¶14** Applying the *expressio unius* canon, we infer that the legislature's decision to include the terms "sell, lease, assign," and "mortgage," but not "condemn" or any variant thereof was intentional. Similarly, the doctrine of *noscitur a sociis* requires us to read the phrase "otherwise dispose of" in light of its surrounding terms "sell, lease, assign" and "mortgage." We decline to stretch the phrase "otherwise dispose of" in § 40-285(A) to cover transfers so markedly different from those the legislature expressly included.

**¶15** The Commission has no authority to regulate the City's utilities. *See* Ariz. Const. art. 15, §§ 2, 3 (excluding municipal corporations from the Commission's regulatory authority); *Menderson v. City of Phoenix*, 51 Ariz. 280, 283 (1938) ("We think that no plainer language could have been used by the makers of the Constitution to state that the constitutional powers conferred upon the Corporation Commission, in regard to the government and regulation of public utilities, were not intended to, and did not, include those owned and operated by municipal corporations of any character."). The Commission conceded before this Court that § 40-285(A) neither authorizes it "to participate in the condemnation proceedings" nor requires the City to obtain Commission permission to commence a condemnation. Nevertheless, it argues the statute allows it to order Circle City to provide information regarding its transfer of assets to the City so that the Commission itself can determine whether the transfer falls under its authority.

**¶16** But the power to solicit information is nowhere conferred by the text of § 40-285(A), nor did the Commission merely solicit information.

And if the Commission is correct that § 40-285(A) applies to eminent domain proceedings in any respect, then, by the plain language of the statute, Circle City must obtain Commission approval to transfer its assets to the City. Failure to obtain Commission approval would render the City's condemnation void. This would effectively create a Commission veto over municipal acquisition of utilities—a result at odds with our constitution's clear exclusion of municipalities from Commission regulation. *See Menderson*, 51 Ariz. at 283. The Commission's argument is therefore inconsistent with the statute's language, the Arizona Constitution, and the Commission's own recognition that it may not regulate municipal utilities.

¶17 The Commission's argument is also in tension with legislative intent in enacting § 40-285(A), which was "to prevent 'looting' of a utility's facilities and impairment of service to the public." *Babe Invs. v. Ariz. Corp. Comm'n*, 189 Ariz. 147, 151 (App. 1997) (citing *Am. Cable Television, Inc. v. Ariz. Pub. Serv. Co.*, 143 Ariz. 273, 277 (App. 1983)). The constitutional requirement that public property generally be taken only for "public use" already prevents the City from "looting" any public utilities' assets to the detriment of the public. *See* Ariz. Const. art. 2, § 17; *City of Phoenix v. Superior Court*, 137 Ariz. 409, 411 (1983) ("[G]enerally no condemning body may exercise the power of eminent domain unless the property which is to be taken is to be put to a 'public use.'"). Applying § 40-285(A) to condemnations would render this constitutional guarantee wholly superfluous.

¶18 We find further support in the California Court of Appeal's interpretation of a statute nearly identical to § 40-285(A). *See Am. Cable Television, Inc.*, 143 Ariz. at 278 (finding § 40-285 consistent with § 851 of California's Public Utility Code). In *People ex rel. Public Utilities Commission v. City of Fresno*, the California Court of Appeal recognized that "eminent domain is an attribute of sovereignty and must not be restricted by judicial interpretation in the absence of a clear legislative intent to so restrict." 62 Cal. Rptr. 79, 84 (Ct. App. 1967). The statute in *City of Fresno* did not "precisely mention the taking of such property by a public entity through the exercise of the power of eminent domain." *Id.* As such, the statute permitted only a "very weak inference[]" that condemnation proceedings required commission approval. *Id.* The court found this weak inference untenable in light of a more specific statutory provision that "[u]nequivocally empower[ed] a city to condemn public utility property even though it ha[d] already been appropriated to a public use," *id.*, and

concluded that the general statute was therefore not a restriction on the city, nor did it prevent the city from exercising its right of eminent domain, *id.* at 87.

¶19 Here, as in *City of Fresno*, any inference of Commission power over eminent domain permitted by § 40-285(A)'s text is untenable in light of the City's express authorization to condemn public utilities. *See* A.R.S. § 9-511(C) ("The municipality may exercise the right of eminent domain either within or without its corporate limits for the purposes as stated in subsection A . . . ."); *id.* § 9-516(B) ("The city or town which seeks to acquire the facilities of a public service corporation shall have the right to do so under eminent domain."). We decline to interpret § 40-285 as granting the Commission power over condemnations, thereby restricting the City's power of eminent domain, without clear legislative intent to do so.

¶20 Lastly, to the extent the Commission argues that A.A.C. R14-2-402(D) confers jurisdiction where the statute does not, we disagree. "The Corporation Commission has no implied powers and its powers do not exceed those to be derived from a strict construction of the Constitution and implementing statutes." *Commercial Life Ins. Co. v. Wright*, 64 Ariz. 129, 139 (1946).

¶21 The partial dissent does not dispute that the City has the right to condemn public utilities. Nor does it dispute that if a public utility refuses to cooperate in a sale of its assets, the City may invoke its power of eminent domain. Nonetheless, relying on dicta in a case from another jurisdiction, the dissent draws a line between contested and uncontested condemnations, giving the Commission authority over the latter but not the former. Effectively, the dissent empowers the Commission to veto a municipal corporation's eminent domain decision based only on the determination that it is not sufficiently adversarial. This approach makes sense only if we accept the dissent's selective use of dictionary definitions, *see infra* ¶ 42 (defining the power of eminent domain by selecting one of six entries for a term, ignoring the more relevant entries with contrary implications), and its strained application of the general terms canon, *see* Scalia & Garner, *supra*, at 101–03 (general terms canon instructs that terms like "*all* persons" and "*any* property" not be arbitrarily limited, but does not apply when context provides "*some indication to the contrary*" (emphasis added)). This we decline to do.

**¶22** The dissent argues that a "friendly" condemnation, which it understands as one that "bears the indicia of a voluntary sale," is subject to the Commission's jurisdiction under § 40-285(A). *Infra* ¶ 41. Under the dissent's expansive view, if the condemnee-utility fails to object to either the inevitable condemnation or the amount of the City's monetary offer, the City must obtain Commission approval for the sale. But by drawing a line between contested and uncontested condemnations, giving the Commission authority over the latter but not the former, the dissent misconstrues the power of eminent domain. The government has the right to condemn property for public use irrespective of the condemnee's mindset. And this makes sense: why should a condemnee's willingness to sell his property limit the government's inherent power (and here, the City's express statutory right, *see* § 9-516(B)) to condemn it? Such a rule would "turn on serendipity," *Saban v. Ariz. Dep't of Trans.*, No. CV-18-0080, 2019 WL 905192, at *3 ¶ 15 (Ariz. Feb. 25, 2019), not on law.

**¶23** More problematic, the dissent's view would expand the Commission's power well beyond the limits set by our legislature. By claiming that the Commission's "jurisdiction over a public utility is not extinguished until the transfer is complete," *infra* ¶ 44, the dissent would give the Commission power over the condemnation proceeding itself. Not even the Commission makes this claim.

**¶24** The dissent worries that our decision risks leaving Circle City customers (here, the developer) without service. Regardless, our constitution and our legislature bestowed the exclusive authority to regulate municipal utilities upon municipalities, along with the authority to condemn the property of public service corporations. *See* Ariz. Const. art. 15, §§ 2, 3 (excluding municipal corporations from the Commission's regulatory authority); § 9-511 (empowering municipal corporations to own, operate, and condemn utilities). This Court should not rewrite § 40-285(A) to expand the regulatory authority of the Commission.

**¶25** The dissent's related concern that the legislative remedy of issuing a new certificate of convenience and necessity ("CC&N") "may prove illusory" because other providers "might" not exist has no basis in the record and we do not consider it. *See State v. Bible*, 175 Ariz. 549, 568 (1993) (noting that when "[t]he record does not show" a fact, "we will not speculate" about it).

**¶26** The Attorney General opinion, relied on by the dissent, expressly disclaims the dissent's premise by acknowledging that a condemnation divests the Commission of jurisdiction over a utility and its CC&N. Op. Ariz. Att'y Gen. 62-7, at 12 (1962) (stating that "the Commission continues to retain jurisdiction over the utility and its certificate" during the pendency of a voluntary sale to a municipality but "[a]s an alternative procedure, the municipality may of course condemn" the utility to avoid Commission oversight).

**¶27** To the extent the dissent suggests the City's proposed condemnation is fraudulent, an abuse of discretion, or otherwise improper with respect to the developer, any remedy for a claim to future water from Circle City is outside the scope of this litigation. We here express no opinion on the merits of such a claim or the remedies in such an action.

**¶28** Our decision today does not preclude the Commission from continuing to regulate any portion of Circle City's service area left unserved following the City's condemnation. The Commission can issue a new CC&N to a public utility if the City declines to provide water service to customers in Circle City's service area, including the developer who originally contracted with Circle City. *See* § 9-516(D) ("[I]f [after the condemnation] the city or town refuses to provide utility service to a portion or part of the area or territory previously authorized to the public utility, the [Commission] may issue a new certificate of convenience and necessity or franchise to a public utility to provide utility service in that portion or part of the area or territory."). The Commission simply has no role to play in condemnations.

### III.   CONCLUSION

**¶29** We vacate paragraph 1 of the Commission's March 30, 2018 order. We deny the City and Circle City's requests for attorney fees.

BOLICK, J., concurring in part and dissenting in part.

¶30 I agree with the majority that the Arizona Corporation Commission has no authority "to regulate the condemnation of water utilities," the narrow question the City presented to us on special action review, and that the City has standing to pursue the action. However, the Court goes further to divest the Commission of authority to protect the interests of water consumers in the event the transfer of the water utility here is actually a voluntary transaction dressed up as an exercise of eminent domain.

¶31 The majority correctly identifies the usual dividing line regarding which governmental acquisitions of private water facilities require Commission approval: if they are voluntary transactions, they do; if they are involuntary transactions effectuated through eminent domain, they do not. Unfortunately, the majority ignores the more difficult question that may be presented here: what happens when the acquisition is voluntary *and* consummated through eminent domain? The majority holds that the moment a municipality announces its intention to use eminent domain, the Commission's authority to protect water consumers dissolves. I cannot join that holding for it elevates form over substance and defeats important statutory objectives underlying the Commission's jurisdiction.

¶32 I wish I could share the majority's certitude that this scenario is resolved through clear statutory language. But neither the statutes creating the Commission's authority to protect water consumers nor those pertaining to a municipality's eminent domain authority speak directly to this circumstance.

¶33 When two sets of statutes address a situation, we should endeavor to harmonize them and give effect, if possible, to all the provisions. *State v. Bowsher*, 225 Ariz. 586, 589 ¶ 14 (2010). The majority suggests that, because several other statutes deal with the issue of condemnations generally, it is necessary to rewrite A.R.S. § 40-285(A) for it to have any effect in this circumstance. *See supra* ¶¶ 19, 24, 28. To the contrary, the eminent domain statutes and the Commission's authorizing statute can both apply here.

¶34 Under § 40-285(A), the Commission possesses authority over a public service company when it "sell[s], lease[s], assign[s], mortgage[s] or otherwise dispose[s] of" its system. The term "otherwise dispose of" is broad enough to encompass a transfer through eminent domain that is the product of voluntary agreement. Indeed, broad general terms, like "otherwise dispose of," must be "accorded their full and fair scope" and may not be "arbitrarily limited." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 101 (2012). By refusing to recognize "otherwise dispose of" as including a voluntary transfer by eminent domain, the majority ignores the term's expansive breadth and arbitrarily creates an ad hoc exception. *See Phillips v. O'Neil*, 243 Ariz. 299, 302 ¶ 11 (2017) (applying general terms canon and noting that courts should not create "ad hoc exceptions" to otherwise broad, general terms (quoting Scalia & Garner, *supra*, at 101)). Moreover, while the majority invokes the *noscitur a sociis* canon, it rejects where the canon leads. The *noscitur a sociis* canon suggests "words grouped in a list should be given related meanings." Scalia & Garner, *supra*, at 195 (quoting *Third Nat'l Bank in Nashville v. Impac Ltd.*, 432 U.S. 312, 322 (1977)); *see also Estate of Braden ex rel. Gabaldon v. State*, 228 Ariz. 323, 326 ¶ 13 (2011) (applying *noscitur a sociis* canon). "Otherwise dispose of," like the terms that precede it, connotes a voluntary transfer, as the majority recognizes, *supra* ¶¶ 11–14. Thus, where eminent domain is the product of voluntary agreement, § 40-285(A) applies and the Commission has jurisdiction over the voluntary transfer.

¶35 Although municipal power to acquire public utilities through eminent domain is unquestioned, *see* A.R.S. § 9-516, nothing in the eminent domain statutes expressly divests the Commission of authority to investigate the nature of the transaction or to protect the public's access to water before the acquisition. The majority correctly states that the Commission has no jurisdiction over municipal water facilities *after* the assets are acquired; but even then, the Commission retains authority to assure continuation of service through a new CC&N if the municipality fails to serve all prior customers under § 9-516(D). *See supra* ¶ 28.

¶36 Indeed, the enabling statute conflates eminent domain and voluntary acquisition. Section 9-515(A) provides that before "constructing, purchasing, acquiring or leasing" a facility for customers who are already served by a public utility, the municipality "shall first purchase and take over the property and plant of the public utility." Regardless of how the

acquisition is effectuated, "[t]he fair valuation of the public utility shall be the equivalent of the compensation to be paid for the taking of private property for public use," as determined by agreement between the municipality and the public utility, by arbitration, or by a court in the eminent domain context. § 9-515(C).

¶37 The best explanation of how the Commission's authority relates to the acquisition of private water companies is provided by a 1962 Attorney General opinion, which although not legally binding is illuminating, especially in the absence of directly applicable Arizona case law. Op. Ariz. Att'y Gen. 62-7 (1962). *See Benevolent & Protective Order of Elks #2656 v. State ex rel. Dep't of Liquor Licenses & Control*, 239 Ariz. 121, 125 ¶¶ 26–27 (App. 2016) (relying on Attorney General opinion in interpreting statute in absence of relevant case law (citing *Ruiz v. Hull*, 191 Ariz. 441, 449 ¶ 28 (1998))). The opinion observes that although § 40-285's main purpose is to prevent looting of assets, the statute also ensures that "the rights of the customers of the utility will be adequately protected." Op. Ariz. Att'y Gen. 62-7, *supra*, at 12; *see also Babe Invs. v. Ariz. Corp. Comm'n*, 189 Ariz. 147, 151 (App. 1997) ("The legislature enacted A.R.S. section 40-285 to prevent 'looting' of a utility's facilities and *impairment of service to the public*." (emphasis added) (citation omitted)). Consequently, when a municipality seeks to acquire the assets of a public utility "by negotiation[,] . . . [b]efore [the seller-utility] can become a party to a valid agreement it must secure permission of the Corporation Commission under A.R.S. § 40-285." Op. Ariz. Att'y Gen. 62-7, *supra*, at 11–12.

¶38 The majority deems that analysis irrelevant because it views the transaction here as inherently involuntary, noting that the Attorney General opinion itself states that "[a]s an alternative procedure, the municipality may of course condemn as provided in A.R.S. § 9-515(C)(3), by court action." *Id.* at 12. But the opinion emphasizes that "[u]ntil [the public utility company] is relieved by the Commission of its duties, and the [CC&N] is retired, it is subject to the Commission's regulation." *Id.* at 11. In the interim, between the time the municipality begins the process of obtaining the public utility's assets and the culmination of that process, the Commission has the authority to ensure "that there are no other customers or persons who have been served by the private utility and that it will, in fact, have been relieved of all its duties to serve such customers." *Id.* at 14. Specifically, "[t]he duties and powers of the Commission are limited to the

necessary hearings and orders to make sure that sale by the utility will not leave persons served neither by the utility nor the municipality." *Id.* at 12; *see also Pueblo Del Sol Water Co. v. Ariz. Corp. Comm'n*, 160 Ariz. 285, 286 (App. 1988) ("[T]he Commission should examine all the evidence available to it to determine whether or not the transfer is detrimental to the public interest."). It appears that is exactly the role the Commission was attempting to fill in this case.

**¶39** In November 2013, Circle City initiated an action before the Commission to remove the development from its CC&N, which would divest the developer of any CAP water rights. Circle City alleged that the developer had abandoned the project. The Commission rejected Circle City's application, finding that the developer had not abandoned the project. Only thereafter did the City initiate condemnation proceedings, and it has taken the position that it has no obligation to provide the developer with water service.

**¶40** If the City and Circle City voluntarily entered into eminent domain proceedings in order to divest the developer of valuable water rights, there could be a collision between the City's eminent domain powers, which are beyond the Commission's jurisdiction, and the Commission's broad authority under § 40-285(A) that ensures that customers' service rights are protected in a voluntary transfer of assets. In such circumstances, the remedy of approving a new CC&N under § 9-516(D) may prove illusory because no other provider might exist to provide such services; only the remedy of disapproval would preserve the customers' rights. *See Babe Invs.*, 189 Ariz. at 151 (noting § 40-285 "prevent[s] . . . impairment of service to the public"). And the "public use" requirement of eminent domain, *Bailey v. Myers*, 206 Ariz. 224, 230 ¶ 23 (App. 2003), is not a substitute for the public-interest objectives served by § 40-285(A). Reading the statutes to permit a municipality and a water company to extinguish contracted water services by agreeing to proceed through eminent domain rather than a sale of assets would defeat the important consumer protection purpose of § 40-285(A). *See James P. Paul Water Co. v. Ariz. Corp. Comm'n*, 137 Ariz. 426, 429 (1983) ("[T]he public interest is the controlling factor in decisions concerning service of water by water companies.").

¶41        Although ordinarily the exercise of eminent domain is coercive and involuntary, a "friendly condemnation," which is widely recognized in the law, is one "in which the condemnee desires the condemnation as ardently as does the condemnor," a situation in which "important community concerns may receive short shrift." *E. Thirteenth St. Cmty. Ass'n v. N.Y. State Urban Dev. Corp.*, 641 N.E.2d 1368, 1372 (N.Y. 1994); *see also St. Joe Corp. v. McIver*, 875 So. 2d 375, 378 n.1 (Fla. 2004) ("In a friendly condemnation, the State agrees to condemn property that the owner desires for the State to condemn, and the State buys the property at an arms-length negotiated price."). The concept of friendly condemnation encompasses not only situations where the parties agree to the terms of condemnation, which happens frequently, but also the far more troubling situation where the parties agree to invoke eminent domain to divest the Commission of its duty and authority to protect utility consumers' water rights. In the latter situation, the transaction as a whole is *entirely* voluntary (even if some terms are disputed) yet clothed in the façade of a government power that otherwise is by its nature coercive.[1] Indeed, a friendly condemnation bears the indicia of a voluntary sale.

¶42        In contrast, eminent domain is "the sovereign right of the state to *appropriate* private land for the public good, subject to the constitutional limitation that the property owner is justly compensated." *Calmat of Ariz. v. State ex rel. Miller*, 176 Ariz. 190, 193 (1993) (emphasis added). The verb "appropriate" commonly means "to take without permission." *Appropriate*, Webster's Third New International Dictionary (3d ed. 2002). If the exercise of the power of eminent domain means to take private property without permission, then a voluntary agreement by the parties to use eminent domain simply cannot be viewed as a true condemnation.

¶43        A decision by the New Mexico Supreme Court that I, like the majority, deem highly persuasive, appears to be the only decision to

---

[1] Although the eminent domain power is broad, it is not boundless, as the majority observes, *supra* ¶ 17. *See* Ariz. Const. art. 2, § 17; *Bailey*, 206 Ariz. at 230 ¶ 23. Just as a court should look behind the government's bare assertion that a particular exercise of eminent domain is for a public use, so also under the statutes should it determine whether the exercise of eminent domain is truly involuntary in this context.

16

expressly contemplate this scenario. In *United Water New Mexico, Inc. v. New Mexico Public Utility Commission*, the court applied a statute similar to § 40-285(A), construing the terms "sell, lease, rent, purchase or acquire" as "address[ing] *voluntary acts* by a public utility." 910 P.2d 906, 909–10 (N.M. 1996). The court held that a "forced condemnation of a utility by a municipality is not a voluntary, affirmative act of that utility," and therefore the public utility commission had no authority over it. *Id.* In contrast to the apparent situation here, the utility in that case vigorously contested the condemnation. *Id.* at 911. In fact, the court premised its decision entirely on the involuntary nature of the transaction, and expressly reserved "the issue of a utility agreeing with a municipality to submit willingly to a condemnation action in lieu of a consensual sale simply to avoid" commission approval. *Id.* at 909 n.4. Like the New Mexico Supreme Court, we should not foreclose a case where the use of eminent domain may constitute a wholly voluntary transaction.

¶44          I agree with the majority that if the acquisition here is involuntary, the Commission has no authority to veto the acquisition. But if the public utility and the City agreed to use eminent domain to avoid a contractual liability, the transaction cannot properly be characterized as involuntary. It was, and still is, unclear whether the City intended to condemn Circle City's public utility assets with or without Circle City's agreement. In other words, as far as the Commission knew, what the City and Circle City were really proposing was a voluntary, arms-length transaction to purchase Circle City under the guise of a condemnation. Section 40-285 assigns to the Commission the responsibility and authority to protect consumers' rights where a public utility seeks to voluntarily transfer its assets. The Commission has the power to investigate to meet this responsibility, and its jurisdiction over a public utility is not extinguished until the transfer is complete. Without the power to investigate, there is no way for the Commission to determine whether a transfer is voluntary—and thus subject to the Commission's jurisdiction under § 40-285—or involuntary, which would take the transfer out of the Commission's jurisdiction.

¶45          The upshot of the majority's decision is this: a municipality may evade the Commission's authority to protect consumers' water rights by substituting an entirely consensual contract with an entirely consensual exercise of eminent domain. But "[l]aw reaches past formalism." *Lee v.*

*Weisman*, 505 U.S. 577, 595 (1992). The majority errs in holding that an exercise of a municipality's eminent domain power categorically evaporates the Commission's consumer protection authority even if the transaction is voluntary and designed to eliminate valuable water rights. The parties vigorously dispute whether those rights exist, and the record does not yet illuminate whether the transfer of assets here is truly involuntary. That is because the City launched a preemptive strike to foreclose the Commission's inquiry into that very question. The majority vindicates the City's actions by short-circuiting the Commission's jurisdiction over the public utility which otherwise would have continued until the acquisition was consummated. With great respect to my colleagues, I dissent from the majority's decision to prematurely terminate the Commission's inquiry.